No. 108,494

In the Matter of JOHN C. DAVIS, *Respondent*.

(303 P.3d 250)

Opinion filed February 1, 2013.

*Stanton A. Hazlett*, Disciplinary Administrator, argued the cause and was on the formal complaint for the petitioner.

*John J. Ambrosio*, of Ambrosio & Ambrosio, Chtd., Topeka, argued the cause, and *John C. Davis*, respondent, argued the cause pro se.

*Per Curiam:* This is an original proceeding in discipline filed by the office of the Disciplinary Administrator against the respondent, John C. Davis, of Overland Park, an attorney admitted to the practice of law in Kansas in 1983, and in Missouri in 1968. Respondent's Missouri license has been suspended since May 1, 2012.

On March 20, 2012, the office of the Disciplinary Administrator filed a formal complaint against the respondent alleging violations of the Kansas Rules of Professional Conduct (KRPC). The respondent filed an answer on March 26, 2012. A hearing was held on the complaint before a panel of the Kansas Board for Discipline of Attorneys on May 24, 2012, when the respondent was personally present and was represented by counsel. The hearing panel determined that respondent violated KRPC 1.5 (2011 Kan. Ct. R. Annot. 470) (fees); 1.15 (2011 Kan. Ct. R. Annot. 519) (safekeeping property); 8.4(b) (2011 Kan. Ct. R. Annot. 618) (commission of a criminal act reflecting adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer); 8.4(c) (engaging in conduct involving misrepresentation); and 8.4(d) (engaging in conduct prejudicial to the administration of justice).

Upon conclusion of the hearing, the panel made the following findings of fact and conclusions of law, together with its recommendation to this court:

"FINDINGS OF FACT

. . . .

"7. In 1991, the Respondent began representing [D.N.] in estate planning matters. The Respondent prepared a revocable trust naming [D.N.] as the trustee

and naming himself as the successor trustee. Finally, in the event the Respondent was unable to serve or continue to serve, [D.N.] named Commerce Bank as an additional successor trustee.

"8. Beginning in 1993, [D.N.] had a series of strokes. As a result, [D.N.] asked the Respondent to succeed her as trustee of the trust. The Respondent continued to serve as [D.N.'s] attorney and the attorney for the trust. The Respondent had the responsibility to manage the trust's multi-million dollar investments and make disbursements for the benefit of [D.N.]. Additionally, [D.N.] gave the Respondent a power of attorney for healthcare decisions.

"9. Following her husband's death, [D.N.] moved into an apartment at a nursing facility. From that point forward she lived in skilled nursing facilities, assisted living communities, and rehabilitation centers for the rest of her life.

"10. In 1996, the Respondent, in his capacity as trustee of the trust, hired the Respondent's wife to serve as an advocate for [D.N.]. The Respondent testified that this engagement was initiated at his wife's suggestion. Initially, the Respondent paid Mrs. Davis $25.00 per hour for her services. Over time, Mrs. Davis' hourly rate increased in the Respondent's sole discretion. At the time of [D.N.'s] death in May, 2009, the Respondent paid Mrs. Davis $100.00 per hour for her services. Mrs. Davis was paid in all instances from the trust assets.

"11. Mrs. Davis' duties included supervising other care givers, accompanying [D.N.] to doctor's appointments, visiting [D.N.], and ensuring that the nursing facilities provided [D.N.] with good care.

"12. Mrs. Davis' annual income from serving as [D.N.'s] advocate was as follows:

| | | |
|---|---|---|
| 1996 | $25.00 per hour | $5,706.25 |
| 1997 | $25.00 per hour | $10,268.75 |
| 1998 | $35.00 per hour | $15,233.75 |
| 1999 | $35.00 - $45.00 per hour | $21,985.00 |
| 2000 | $45.00 per hour | $30,172.50 |
| 2001 | $45.00 per hour | $32,996.25 |
| 2002 | $50.00 - $60.00 per hour | $45,207.50 |
| 2003 | $60.00 per hour | $50,350.00 |
| 2004 | $60.00 per hour | $47,070.00 |
| 2005 | $60.00 per hour | $49,050.00 |
| 2006 | $60.00 per hour | $51,390.00 |
| 2007 | $60.00 per hour | $54,585.00 |
| 2008 | $60.00 per hour | $55,095.00 |
| 2009 | $60.00 - $100.00 per hour | $28,510.00 |

(Footnote: In 2009, the Respondent's wife received $28,510.00 for the time period of January through May.) Thus, from 1996 through 2009, the Respondent paid his wife from trust assets a total of $497,620.00 for serving as [D.N.'s] advocate.

"13. During that same period of time, the Respondent's hourly attorney rate went from $185.00 to $380.00 per hour. The Respondent paid his law firm (for services he rendered) the same rate whether the Respondent was performing work

as attorney for the trust or whether he was performing work as trustee of the trust. From 1996 through 2009, the Respondent paid his law firm a total of $801,906.00 in attorney and trustee fees.

"14. On April 13, 2009, the Respondent opened an account, titled 'John C. Davis, Trustee, [D.N.] Trust' at US Bank. Prior to the Respondent opening this account, all of [D.N.'s] bank accounts had been held at Commerce Bank. As noted previously, Commerce Bank was named as an additional successor trustee under the trust instrument. The initial funds deposited into the US Bank account came from the sale of an investment account held by the trust with A.G. Edwards. The initial deposit at US Bank was for $119,595.08. Two days after opening the account, on April 15, 2009, the Respondent wrote three checks drawn on the trust's account at US Bank as follows:

| 1001 | Internal Revenue Service | $70,000.00 |
| 1002 | Kansas Income Tax | $7,000.00 |
| 1003 | Mo. Dept. of Revenue | $6,000.00 |

The Respondent used the three checks to pay the Respondent's joint marital 2008 income tax liability. On two of the checks, the Respondent struck through '[D.N.] Trust.' And, on all three of the checks, the Respondent hand-wrote his personal social security number. The Respondent did not have authority from [D.N.] to use trust funds in this fashion. Further, the Respondent did not inform [D.N.] nor her beneficiaries that he used the trust's assets to pay his personal marital income tax liabilities.

"15. The Respondent testified that at the time the Respondent converted the trust assets to his own use, he had sufficient personal assets to pay his own tax obligations.

"16. On May 23, 2009, [D.N.] died.

"17. In January 2010, [R.E.], as part of his administrative duties as chair of the tax, trusts, and estate division of the Respondent's law firm, Stinson Morrison Hecker, reviewed matters on which the Respondent, a member of that division, was working. [R.E.] discovered that a significant portion of the Respondent's time billed during the previous year had been devoted to [D.N.'s] trust and estate. During his review, [R.E.] became concerned that the Respondent was billing excessive amounts of time for the tasks detailed in the billing records. Additionally, [R.E.] noted that many of the Respondent's time entries were in even hour increments rather than in tenth of an hour increments that are standard for Stinson Morrison Hecker billing. Finally, [R.E.] also discovered that the Respondent had been paying the Respondent's wife from [D.N.'s] estate and trust assets.

"18. [R.E.] reported his concerns to the law firm's general counsel, [L.J.]. The law firm conducted additional investigation. During the investigation, [R.E.] and [L.J.] met with the Respondent on two occasions. During those meetings, the Respondent acknowledged that he 'rounded up' some of his time entries. The Respondent failed to disclose that he used [D.N.'s] trust funds to pay his personal marital income tax liabilities for 2008.

"19. After being questioned by [R.E.] and [L.J.], on January 21, 2010, the Respondent deposited $83,000.00 into [D.N.'s] trust account at US Bank. Additionally, the Respondent deposited into [D.N.'s] trust account at US Bank $1,490.00 for interest on the $83,000.00 that he had converted to his personal use on April 15, 2009. On the trust account ledger, the Respondent noted that the $83,000.00 deposit was for 'tax refunds.' Additionally, on the trust account ledger, the Respondent noted that the $1,490.00 was for 'interest on refunds.'

"20. On February 8, 2010, the Respondent withdrew as a partner with Stinson Morrison Hecker. At that time, the Respondent agreed to leave his partner capital account with the law firm to cover any expenses associated with his misconduct. The Respondent testified that at the time the Respondent departed Stinson Morrison Hecker, the Respondent's partner capital account was approximately $50,000.

"21. On March 2, 2010, the Respondent resigned as trustee of [D.N.'s] trust. At that time, Commerce Bank took over as successor trustee of the trust.

"22. Stinson Morrison Hecker informed Commerce Bank that it would fairly compensate the trust for amounts that were billed inappropriately by the Respondent. As a result of their pledge, Stinson Morrison Hecker ultimately agreed to and did pay the trust $433,604.23. According to Stinson Morrison Hecker, that amount represents a refund of $279,177.98 of the fees paid by the trust to the law firm for the Respondent's attorney's fees and reimbursement of $154,426.25 of the payments made by the trust to Mrs. Davis for serving as an advocate for [D.N.].

"23. Regarding restitution payments made by the Respondent, the Respondent replaced the $83,000.00 he converted. Additionally, the Respondent deposited $1,490.00 as payment of interest on the $83,000.00. Finally, at the time Stinson Morrison Hecker terminated the Respondent, the Respondent had approximately $50,000.00 in his partner capital account. The Respondent agreed to forgo repayment of his partner capital account when he left Stinson Morrison Hecker. The Respondent made no attempt to contact Commerce Bank or the trust beneficiaries or to otherwise make restitution or confirm that adequate restitution was paid by the law firm.

"24. On April 20, 2010, [R.E.] and [L.J.] filed a complaint with the Disciplinary Administrator's office. At approximately that same time, a complaint was filed with the Missouri bar disciplinary authorities.

"25. On May 14, 2010, the Respondent provided a written response to the complaint filed with the Kansas Disciplinary Administrator. In the response, the only statement made by the Respondent which would amount to accepting responsibility for his actions was to say:

'It is possible I could have been more precise in describing and perhaps I could have been more efficient, but the trust/estate administration required a good deal of time which I expended. I did not at any time overcharge for my work either for my own benefit or for the benefit of the firm.

I did not take advantage of the trust estate or its beneficiaries and did not act dishonestly or deceitfully.'

Nowhere in the Respondent's written response did he admit to 'rounding up' his time. Additionally, again, the Respondent failed to disclose his conversion of [D.N.'s] trust funds that he used to pay his personal marital tax liabilities.

"26. Later, on September 15, 2010, [L.J.] supplemented his complaint with the Kansas Disciplinary Administrator with information regarding the trust checks that the Respondent wrote to the taxing authorities. It appears that the Respondent did not respond to the allegations contained in [L.J.'s] supplemental complaint.

"27. On May 1, 2012, the Supreme Court of Missouri concluded that the Respondent violated three provisions of the Missouri Rules of Profession Conduct; sections 4-8.4(b), 4-8.4(c), and 4-8.4(d). The Supreme Court of Missouri suspended the Respondent for a period of three years for a portion of the conduct addressed in this final hearing report. The Missouri Supreme Court considered only the Respondent's conversion of [D.N.'s] trust funds for payment of the Respondent's personal marital income taxes. It does not appear that the Missouri Supreme Court considered whether the Respondent violated Missouri's equivalent to KRPC 1.5 or KRPC 1.15.

"28. At the disciplinary hearing, the Respondent testified as to his practice of rounding up time to the nearest full hour and stated that his billing practice on [D.N.'s] file was consistent with his practices for his other clients.

"29. The Respondent admitted to violating KRPC 1.5, KRPC 1.15, KRPC 8.4(b), KRPC 8.4(c), and KRPC 8.4(d).

## "CONCLUSIONS OF LAW

"30. Based upon the findings of fact, the Hearing Panel concludes as a matter of law that the Respondent violated KRPC 1.5, KRPC 1.15, and KRPC 8.4, as detailed below.

"31. KRPC 1.5 requires attorneys to charge reasonable fees. Rounding up time constitutes billing for work not performed. Billing for work not performed is *per se* unreasonable. Accordingly, the Hearing Panel concludes that the Respondent charged an unreasonable fee.

"32. Lawyers must keep the property of their clients safe. *See* KRPC 1.15. In this case, the Respondent failed to properly safeguard [D.N.'s] property when he converted $83,000.00 and used it to pay his personal marital income tax liabilities. Therefore, the Hearing Panel concludes that the Respondent violated KRPC 1.15.

"33. 'It is professional misconduct for a lawyer to . . . commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects.' KRPC 8.4(b). In this case, the Respondent committed the crime of theft when he knowingly converted [D.N.'s] money and used it for his own purposes. The crime of theft is a crime of dishonesty. Accordingly, the Hearing Panel concludes that the Respondent committed a criminal act and that

criminal act reflects directly on the Respondent's honesty, trustworthiness, and fitness as a lawyer in other respects, in violation of KRPC 8.4(b).

"34. Further, '[i]t is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation.' KRPC 8.4(c). The Respondent engaged in conduct that involved dishonesty when he knowingly converted [D.N.'s] property and used it to pay his personal marital income tax liability. Further, the Respondent engaged in additional dishonest conduct in an attempt to cover up his theft of the money by making false entries in the ledger for the US Bank account after he replaced the money in the account. The Respondent indicated that the deposits were for tax refunds and interest on the tax refunds. As such, the Hearing Panel concludes that the Respondent violated KRPC 8.4(c).

"35. Finally, '[i]t is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice.' KRPC 8.4(d). In this case, the Respondent engaged in 'conduct that is prejudicial to the administration of justice' when he established a new trust bank account at US Bank for his own personal purposes. As such, the Hearing Panel concludes that the Respondent violated KRPC 8.4(d).

"AMERICAN BAR ASSOCIATION
"STANDARDS FOR IMPOSING LAWYER SANCTIONS

"36. In making this recommendation for discipline, the Hearing Panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"37. *Duty Violated.* The Respondent violated his duty to his client to properly safeguard her property. Additionally, the Respondent violated his duty to his law firm and the legal profession to maintain his personal integrity.

"38. *Mental State.* The Respondent knowingly and intentionally violated his duties.

"39. *Injury.* As a result of the Respondent's misconduct, the Respondent caused actual injury to [D.N.'s] estate, to Stinson Morrison Hecker, and the legal profession.

"40. *Aggravating or Mitigating Factors.* Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following aggravating factors present:

"41. *Dishonest or Selfish Motive.* The Respondent's misconduct was motivated by dishonesty and selfishness. Despite the Respondent's statements to the contrary, the Respondent's conversion of $83,000.00 of trust funds was not a loan. The Respondent intentionally converted trust property. Intentional conversion is a dishonest and selfish act. Additionally, the Respondent failed to exercise pro-

fessional judgment when he retained his wife to serve as [D.N.'s] advocate. Hiring his wife to serve in this capacity constitutes selfish conduct.

"42. *A Pattern of Misconduct.* The Respondent engaged in a pattern of dishonest conduct by committing a number of dishonest acts over a period of many years. First, he engaged in a pattern of 'rounding up' his time charged to [D.N.'s] estate, and, by his own admissions, his other clients. Next, he engaged in a series of events involving dishonesty by establishing the US Bank account, having [D.N.'s] funds deposited into the account, using the account to pay his personal marital income taxes, by failing to replace the money until after Stinson Morrison Hecker launched an investigation into his representation of [D.N.], and by making false entries on the ledger associated with the US Bank account. Finally, the Respondent engaged in a pattern of dishonesty when he failed to disclose that he converted [D.N.'s] money for his own use by using it to pay his personal marital income tax liability. This included the Respondent's intentional dishonest representation to the Disciplinary Administrator in his May 14, 2010, letter, where he states: 'I did not take advantage of the trust estate or its beneficiaries and did not act dishonestly or deceitfully.'

"43. *Vulnerability of Victim.* [D.N.] was extremely vulnerable to the Respondent's misconduct. She had no one overseeing her financial business, other than the Respondent. She was unable to effectively communicate following her strokes. Accordingly, the Hearing Panel concludes that it can envision few victims who would be more vulnerable than [D.N.].

"44. *Substantial Experience in the Practice of Law.* The Missouri Supreme Court admitted the Respondent to the practice of law in 1968. Additionally, the Kansas Supreme Court admitted the Respondent to the practice of law in 1983. Accordingly, the Hearing Panel concludes that the Respondent had substantial experience in the practice of law at the time he engaged in the misconduct.

"45. *Indifference to Making Restitution.* To date, other than replacing the converted funds and paying a small amount of interest on the converted funds, the only effort the Respondent has made to make restitution was leaving his partner capital account of approximately $50,000 behind at the time he withdrew from Stinson Morrison Hecker. The Respondent has not communicated or attempted to communicate with Commerce Bank, Stinson Morrison Hecker, or the beneficiaries regarding appropriate restitution.

"46. *Illegal Conduct, Including that Involving the Use of Controlled Substances.* The Respondent engaged in illegal conduct when he knowingly converted [D.N.'s] property.

"47. Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following mitigating circumstances present:

"48. *Absence of a Prior Disciplinary Record.* Other than the concurrent disciplinary proceedings in Missouri, the Respondent has not been disciplined.

"49. *Personal or Emotional Problems if Such Misfortunes Have Contributed to Violation of the Kansas Rules of Professional Conduct.* While the Respondent presented some evidence of personal problems, the Hearing Panel concludes that the evidence presented is not compelling. In addition, the evidence presented indicated that the Respondent blamed his wife for much of his personal problems which reflected the Respondent's reluctance to accept responsibility for his own actions. Accordingly, the Hearing Panel concludes that personal or emotional problems are not a mitigating factor in this case.

"50. *The Present Attitude of the Attorney as Shown by His or Her Cooperation During the Hearing and His or Her Full and Free Acknowledgment of the Transgressions.* During the hearing, the Respondent acknowledged the misconduct. However, the Respondent failed to initially acknowledge his misconduct and withheld the information first from his law firm's investigation and later from the investigator assigned by the Disciplinary Administrator. Further, the Respondent never fully acknowledged his conversion of [D.N.'s] funds, instead characterizing them as a loan, in direct opposition to the evidence and without any colorable support for such assertion.

"51. *Previous Good Character and Reputation in the Community Including Any Letters from Clients, Friends and Lawyers in Support of the Character and General Reputation of the Attorney.* The Respondent presented letters regarding his good character and reputation. The Hearing Panel accepted the letters of the Respondent's previous good character.

"52. *Imposition of Other Penalties or Sanctions.* The Missouri Supreme Court suspended the Respondent's license to practice law in the State of Missouri for a period of three years.

"53. *Remorse.* At the hearing on the formal complaint, the Respondent expressed remorse. However, the Hearing Panel was not convinced that the Respondent was remorseful for the misconduct. It appeared that the Respondent's remorse was limited to the predicament that the Respondent currently finds himself in.

"54. In addition to the above-cited factors, the Hearing Panel has thoroughly examined and considered the following Standards:

'4.11　Disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client.

'5.11　Disbarment is generally appropriate when:

. . . .

(b) a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that serious adversely reflects on the lawyer's fitness to practice.'

### "RECOMMENDATION

"55. The Disciplinary Administrator recommended that the Respondent be indefinitely suspended from the practice of law. The Respondent joined in the

Disciplinary Administrator's recommendation for an indefinite suspension from the practice of law.

"56. The Hearing Panel recognizes that it is an unusual event for a Hearing Panel to recommend discipline greater than recommended by the parties. However, the Respondent's misconduct in this case is so serious that the ultimate sanction of disbarment is appropriate.

"57. The Respondent established the US Bank account on April 13, 2009, with proceeds from the sale of investments in [D.N.'s] trust's account with A.G. Edwards. Prior to this event, all of the trust's bank accounts had been maintained at Commerce Bank, successor trustee of the trust. Two days later, the Respondent wrote three checks drawn on that account to pay for personal obligations. Clearly, opening the account was done to perpetuate a fraud.

"58. The Respondent knowingly converted an elderly, disabled client's funds and used those funds to pay his personal marital income tax liability. The Respondent has minimized his responsibility for this act by describing it as 'borrowing' $83,000.00. However, the fact that the Respondent did not replace the funds in [D.N.'s] account until after the law firm launched its investigation leads the Hearing Panel to conclude that the Respondent may never have paid those monies back had the law firm not investigated his representation of [D.N.'s] trust.

"59. The Respondent overpaid his law firm and overpaid his wife more than $400,000.00, according to the agreement between Commerce Bank and Stinson Morrison Hecker.

"60. Finally, to compound his misconduct, the Respondent failed to disclose to [R.E.] and [L.J.] the conversion of [D.N.'s] funds during the investigation of the Respondent's representation of [D.N.]. The Respondent went on to assert to the Disciplinary Administrator that he had not taken advantage of the trust or its beneficiaries and did not act dishonestly or deceitfully.

"61. By itself, theft of client funds warrants disbarment. However, in this case, the Respondent's misconduct is compounded by various other dishonest acts.

"62. Based upon the findings of fact, conclusions of law, and the Standards listed above, the Hearing Panel unanimously recommends that the Respondent be disbarred.

"63. Costs are assessed against the Respondent in an amount to be certified by the Office of the Disciplinary Administrator."

## DISCUSSION

In a disciplinary proceeding, this court considers the evidence, the findings of the disciplinary panel, and the arguments of the parties and determines whether violations of KRPC exist and, if they do, what discipline should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Foster*, 292 Kan. 940, 945, 258 P.3d 375 (2011); see Supreme Court Rule

211(f) (2011 Kan. Ct. R. Annot. 334). Clear and convincing evidence is " 'evidence that causes the factfinder to believe that "the truth of the facts asserted is highly probable." ' " *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009) (quoting *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]).

The respondent was given adequate notice of the formal complaint, to which he filed an answer, and adequate notice of both the hearing before the panel and the hearing before this court. The respondent filed no exceptions to the hearing panel's final hearing report. The panel's findings of fact are thus deemed admitted. See Supreme Court Rule 212(c), (d) (2011 Kan. Ct. R. Annot. 352).

The evidence before the hearing panel establishes the charged misconduct of the respondent by clear and convincing evidence and supports the panel's conclusions of law. We therefore also adopt the panel's conclusions.

The only remaining issue before us is the appropriate discipline. At the hearing before this court, the office of the Disciplinary Administrator recommended indefinite suspension. The respondent, through counsel and personally, also requested indefinite suspension. Respondent has continued to minimize his conduct and maintained that he did not take advantage of the trust estate or its beneficiaries. He personally professed to the court that his troubles were born of inefficiencies; that the trust and estate administration required a good deal of time in which he neither overcharged for his own benefit or the benefit of the firm. We are not persuaded by that argument. The respondent knowingly converted an elderly, disabled client's funds and used those funds to pay his wife nearly a half a million dollars for supervising healthcare providers and ensuring that nursing facilities provided adequate care. Further, he used estate funds to pay his personal marital income tax liability. The respondent minimized his responsibility for this act by describing it as "borrowing" $83,000.00. Respondent took money entrusted to him, converted it to his own use, and has yet to fully refund either the estate or the law firm who covered some of his misappropriation from the estate. Disbarment is the appropriate sanction.

## CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that John C. Davis be disbarred from the practice of law in the state of Kansas, effective on the filing of this opinion, in accordance with Supreme Court Rule 203(a)(1) (2011 Kan. Ct. R. Annot. 280).

IT IS FURTHER ORDERED that the respondent shall comply with Supreme Court Rule 218 (2011 Kan. Ct. R. Annot. 379), as amended December 1, 2012, and in the event respondent seeks reinstatement, he shall comply with Supreme Court Rule 219 (2011 Kan. Ct. R. Annot. 380), as amended December 1, 2012.

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to the respondent and that this opinion be published in the official Kansas Reports.